**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**
**CLEVELAND**

| | |
|---|---|
| **EDUARDO BARBOSA,** on behalf of himself and all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>**PROGRESSIVE CASUALTY INSURANCE COMPANY,**<br><br>    Defendant. | Case No. _____<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

<u>**CLASS ACTION COMPLAINT**</u>

Plaintiff Eduardo Barbosa, individually and on behalf of all similarly situated persons, alleges the following against Progressive Casualty Insurance Company ("Progressive" or "Defendant") based upon personal knowledge with respect to himself and on information and belief derived from, among other things, investigation by his counsel and review of public documents, as to all other matters:

## I.    INTRODUCTION

1.    Progressive is an insurance company based out of Mayfield Village, Ohio,[1] that provides a range of insurance products such as, personal and commercial automobile

---

[1] *See* https://www.progressive.com/locations/mayfield-village-oh-campus-1/#:~:text=Corporate%20locations%3A%20Campus%201%20in%20Mayfield%20Village%2C%20Ohio%20%7C%20Progressive.

insurance, motorcycle insurance, boat insurance, property insurance, and recreational vehicle insurance.[2]

2.      Plaintiff and the Class Members (as further defined below) have had their personally identifiable information ("PII") compromised as a result of Progressive's inadequate data security procedures, protocols, and practices. Defendant betrayed the trust of Plaintiff and the other Class Members by failing to properly safeguard and protect their personally identifiable information, thereby enabling unauthorized individuals to view and steal their valuable and sensitive information.

3.      This class action seeks to redress Progressive's unlawful, willful, and wanton failure to protect the PII of **approximately 347,100 individuals** that was accessed and viewed by unauthorized actors in a massive and preventable data breach of Defendant's network (the "Data Breach" or "Breach"), in violation of its legal obligations.[3]

4.      On May 19, 2023, Progressive received written notification that some of its third-party service provider's employees improperly shared their Progressive access credentials with unauthorized individuals who purportedly performed the employees' call center job duties.[4] Progressive investigated the attack with the assistance of third-party computer specialists. Thus, the unauthorized individuals had access to the personal and

---

[2] *See* https://www.progressive.com/.
[3] *See* https://apps.web.maine.gov/online/aeviewer/ME/40/7832b375-dedf-4be0-9437-1329b9c6a55b.shtml.
[4] *See* Exhibit 1.

confidential information of some of Progressive's customers.[5] Progressive did not disclose how many individuals had unauthorized access to the confidential information.

5.     Progressive divulged that the earliest date of employment of any of the potentially involved employees by the third-party service provider was May 2021, but most were hired during or after the fall of 2022.[6] Thus, **the Breach occurred for years**.

6.     According to Progressive, after the Breach was discovered, it launched an investigation.[7] Based on the investigation, it determined that some of their customers' personal information may have been visible to the unauthorized individual(s).[8]

7.     According to the Texas Secretary of State, the personal identifiable information exposed in the Breach included at least: names, addresses, social security numbers, driver's license numbers, financial information (*e.g.*, account number, credit card number and/or debit card number) (the "Private Information").[9] However, what information was exposed differs from victim to victim.

8.     Due to Defendant's negligence and lack of oversight and supervision, unauthorized individuals obtained everything they needed to commit identity theft and fraud and wreak havoc on the financial and personal lives of hundreds of thousands of individuals.

---

[5] *Id.*
[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] *See* https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage.

9.      For the rest of their lives, Plaintiff and the Class Members will have to deal with the danger of identity thieves possessing and misusing their Private Information. Plaintiff and Class Members will have to spend time responding to the Breach and are at an immediate, imminent, and heightened risk of all manners of identity theft as a direct and proximate result of the Data Breach. Plaintiff and Class Members have incurred and will continue to incur damages in the form of, among other things, identity theft, attempted identity theft, lost time and expenses mitigating harms, increased risk of harm, damaged credit, deprivation of the value of their Private Information, loss of privacy, and/or additional damages as described below.

10.     Plaintiff brings this action individually and on behalf of the Class, seeking remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, injunctive relief, reasonable attorney fees and costs, and all other remedies this Court deems proper.

## II.    PARTIES

### *Plaintiff*

11.     Plaintiff **Eduardo Barbosa** is, and at all times mentioned herein was, an individual citizen and resident of Porterville, CA. Plaintiff received a Notice of Data Breach letter ("Notice Letter") dated August 1, 2023, from Progressive informing him that his personal information, including his name, address, driver's license number, email address, phone number, and date of birth were compromised in the Data Breach.

*Defendant*

12.     Defendant **Progressive Casualty Insurance Company** is an Ohio corporation with its principal place of business located at 6300 Wilson Mills Road, Mayfield Village, Ohio, 44143.

### III.     JURISDICTION AND VENUE

13.     The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is over 100, many of whom reside outside the state of Ohio and have different citizenship from Progressive, including Plaintiff. Thus, minimal diversity exists under 28 U.S.C. §1332(d)(2)(A)

14.     This Court has jurisdiction over Progressive because Progressive its principal place of business is in this District, it regularly conducts business in this District, and upon information and belief, some Class Members reside in this district.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because Defendant's principal place of business is located in this District and a substantial part of the events giving rise to this action occurred in this District.

### IV.     FACTUAL ALLEGATIONS

#### A.     The Data Breach

16.     Based on information supplied by Progressive, on May 19, 2023, Progressive received written notification from one of its third-party service providers

regarding an incident involving some of its call center representatives.[10] Apparently, some of the third- party service provider's employees improperly shares their Progressive access credentials with unauthorize individuals, who were then able to access the personal information of certain Progressive customers.[11]

17.     Progressive did not disclose how many individuals obtained unauthorized access, but the Notice Letter indicates that it was certainly more than one unauthorized actor.[12]

18.     **What is perhaps most concerning is that the Data Breach occurred for years, unnoticed and unchecked**. Progressive disclosed that the earliest date of employment of any of the potentially involved employees by the third-party service provider was May 2021, however, most were hired during or after the fall of 2022.[13] Thus, unauthorized individuals had unfettered access to Plaintiff's and the Class's Private Information for more than just days or weeks, but likely years (May 2021 through May 2023). Progressive gave no indication as to when the unauthorized access stopped.

19.     According to disclosures made by Progressive to the Texas Attorney General, the compromised Private Information (or "PII") included sensitive information such as: names, addresses, social security numbers, driver's license numbers, financial information (account numbers, credit card numbers, and/or debit card numbers).[14]

---

[10] *Id.*
[11] *See* Exhibit 1.
[12] *Id.*
[13] *Id.*
[14] *See* https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage.

20.     Despite having known about the Data Breach since May 2023, notices were not sent to affected individuals until on or around August 1, 2023 – almost three months after the fact.

21.     To make matters worse, Progressive is no stranger to inside data security threats. In 2006, a progressive employee wrongfully accessed information confidential customer information, including: names, Social Security numbers, dates of birth, and property addresses.[15] Clearly, Progressive was aware of the harm that could stem from insider threats, but chose to turn a blind eye. Had Progressive addressed insider threats more seriously earlier, it could have prevented this Data Breach from occurring.

22.     Progressive's lax data security practices were more recently called into question again in 2015. This time, telematic devices offered by Progressive were noted to have "dozens of security flaws that could be exploited by hackers" that could cause consequences ranging from "data loss to life and limb."[16]

23.     Due to Progressive's recent run of security flaws and data security incidents, it is evident Progressive does not take data security seriously and does little (if anything) to protect customer data.

---

[15] *See* https://www.computerworld.com/article/2562543/data-breach-at-progressive- 7 highlights-insider-threat.html.

[16] *See* www.insurancebusinessmag.com/us/news/breaking-news/progressive-security- holes-put-2-million-at-risk-21007.aspx ("Telematics devices offered by Progressive Insurance, called 'Snapshot' dongles, boast dozens of security flaws that could be exploited by hackers. According to Corey Thuen, a security researcher at Digital Bond Labs, Progressive's Snapshot device is perilously insecure and vulnerable to remote cyber attacks that could be dangerous for drivers. Thuen suggested that the insurance giant does 'nothing to encrypt or otherwise protect the information [it] collects,' and as such, 'it would be possible to intercept data passed between the dongles and the insurance providers' servers.'").

24.     Overall, Defendant failed to take the necessary precautions required to safeguard and protect Plaintiff's and the other Class Members' Private Information from unauthorized access, including failing to supervise, monitor, and oversee all third-parties it hired who had access to Plaintiff's and the Class's PII. Progressive should have ensured any third-parties it hired had adequate data security procedures, practices, and protocols in place to eliminate unauthorized access. Defendant also failed to provide timely notice to Plaintiff and Class Members.

25.     Defendant's actions represent a flagrant disregard of the rights of the Class Members, both as to privacy and property.

**B.     Plaintiff's Experience**

26.     Plaintiff received a Notice Letter from Progressive informing him that his personal information, including his name, address, driver's license number, email address, phone number, and date of birth were compromised in the Data Breach.[17]

27.     Plaintiff's and Class Members' Private Information was entrusted to Defendant for insurance purposes with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access, including thoroughly vetting all third-parties it hired to ensure they employed adequate data security, procedures, protocols, and practices.

---

[17] *See* Exhibit 1.

28.     Because of the Data Breach, Plaintiff's Private Information is now in the hands of criminals. Plaintiff and all Class Members are now imminently at risk of crippling future identity theft and fraud.

29.     As a result of the Data Breach, Plaintiff has already spent numerous hours responding to the Data Breach. Among other things, Plaintiff has spent time researching and verifying the legitimacy of the Data Breach upon receiving the notice letter and taking other steps in an attempt to mitigate the adverse consequences of the Data Breach. The letter Plaintiff received from Progressive specifically directed him to take these actions.[18]

30.     As a direct and proximate result of the Data Breach, Plaintiff will likely need to purchase a lifetime subscription for identity theft protection and credit monitoring.

31.     Plaintiff has been careful to protect and monitor his identity.

32.     Plaintiff has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff's valuable Private Information; (b) damages to and diminution in value of Plaintiff's Private Information that was entrusted to Defendant with the understanding that Defendant would safeguard this information against disclosure; (c) loss of the benefit of the bargain with Defendant to provide adequate and reasonable data security—*i.e.*, the difference in value between what Plaintiff should have received from Defendant and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security and failing to protect Plaintiff's Private Information; and (d) continued risk to Plaintiff's Private Information,

---

[18] *Id.*

which remains in the possession of Defendant and which is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information that was entrusted to Defendant.

### C. Criminals Will Use Plaintiff's and Class Members' Private Information to Defraud Them

33.     Private Information is of great value to hackers and cyber criminals, and the data stolen in the Data Breach can and will be used in a variety of sordid ways for criminals to exploit Plaintiff and the Class Members and to profit off their misfortune.

34.     Each year, identity theft causes tens of billions of dollars of losses to victims in the United States.[19] For example, with the Private Information stolen in the Data Breach, including Social Security numbers, identity thieves can open financial accounts, apply for credit, file fraudulent tax returns, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or undocumented immigrants, steal government benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft.[20] These criminal activities have and will result in devastating financial and personal losses to Plaintiff and the Class Members.

35.     Social security numbers are particularly sensitive pieces of personal information. As the Consumer Federation of America explains:

---

[19] "Facts + Statistics: Identity Theft and Cybercrime," Insurance Info. Inst., https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (discussing Javelin Strategy & Research's report "2018 Identity Fraud: Fraud Enters a New Era of Complexity").
[20] *See, e.g.*, Christine DiGangi, *5 Ways an Identity Thief Can Use Your Social Security Number*, Nov. 2, 2017, https://blog.credit.com/2017/11/5-things-an-identity-thief-can-do- with-your-social-security-number-108597/.

**Social Security number.** *This is the most dangerous type of personal information in the hands of identity thieves* because it can open the gate to serious fraud, from obtaining credit in your name to impersonating you to get medical services, government benefits, your tax refunds, employment – even using your identity in bankruptcy and other legal matters. It's hard to change your Social Security number and it's not a good idea because it is connected to your life in so many ways.[21]

36.     Private Information is such a valuable commodity to identity thieves that once it has been compromised, criminals will use it for years.[22]

37.     This was a financially motivated Breach, as the only reason the unauthorized individuals would want access to Progressive's customer's information in the first place is to get information that they can monetize by selling on the black market for use in the kinds of criminal activity described herein. Indeed, a social security number, date of birth, and full name can sell for $60 to $80 on the digital black market.[23]  "[I]f there is reason to believe that your personal information has been stolen, you should assume that it can end up for sale on the dark web."[24]

38.     These risks are both certainly impending and substantial. As the Federal Trade Commission ("FTC") has reported, if hackers get access to Private Information, they *will* use it.[25]

---

[21] *Dark Web Monitoring: What You Should Know*, Consumer Federation of America, Mar. 19, 2019, https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should- know/ [Emphasis added.]

[22] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO, July 5, 2007, https://www.gao.gov/assets/270/262904.htmlu.

[23] Michael Kan, *Here's How Much Your Identity Goes for on the Dark Web*, Nov. 15, 2017, https://www.pcmag.com/news/heres-how-much-your-identity-goes-for-on-the-dark-web.

[24] *Dark Web Monitoring: What You Should Know*, Consumer Federation of America, Mar. 19, 2019, https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should- know/.

[25] Ari Lazarus, *How fast will identity thieves use stolen info?*, FED. TRADE COMM'N (May 24, 2017), https://www.consumer.ftc.gov/blog/2017/05/how-fast-will-identity-thieves- use-stolen-info.

39.     Hackers may not use the information right away, but this does not mean it will not be used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information *may continue for years*. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[26]

40.     For instance, with a stolen social security number, which is part of the Private Information compromised in the Data Breach, someone can open financial accounts, get medical care, file fraudulent tax returns, commit crimes, and steal benefits.[27]

41.     The ramifications of Defendant's failure to keep its Class Members' Private Information secure are long lasting and severe. Once that information is stolen, fraudulent use of that information and damage to victims may continue for years. Fraudulent activity might not show up for six to 12 months or even longer.

42.     Further, criminals often trade stolen Private Information on the "cyber black- market" for years following a breach. Cybercriminals can post stolen Private Information on the internet, thereby making such information publicly available.

---

[26] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown,* GAO, July 5, 2007, https://www.gao.gov/assets/270/262904.htmlu.
[27] *See, e.g.*, Christine DiGangi, *5 Ways an Identity Thief Can Use Your Social Security Number*, Nov. 2, 2017, https://blog.credit.com/2017/11/5-things-an-identity-thief-can-do- with-your-social-security-number-108597/.

43.     Approximately 21% of victims do not realize their identify has been compromised until more than two years after it has happened.[28] This gives thieves ample time to seek multiple treatments under the victim's name. Forty percent of consumers found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.[29]

44.     Identity theft victims must spend countless hours and large amounts of money repairing the impact to their credit as well as protecting themselves in the future.[30]

45.     Defendant's offer of limited identity monitoring to Plaintiff and the Class is woefully inadequate and will not fully protect Plaintiff from the damages and harm caused by its failures. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. Once the offered coverage has expired, Plaintiff and Class Members will need to pay for their own identity theft protection and credit monitoring for the rest of their lives due to Progressive's gross negligence. Furthermore, identity monitoring only alerts someone to the fact that they have *already been the victim of identity theft* (*i.e.*, fraudulent acquisition and use of another person's Private Information)—it does not prevent identity theft.[31] Nor

---

[28] *See* Medical ID Theft Checklist, *available at:* https://www.identityforce.com/blog/medical-id-theft-checklist-2.

[29] Experian, *The Potential Damages and Consequences of Medical Identify Theft and Healthcare Data Breaches ("Potential Damages"), available at:* https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id- theft-healthcare.pdf.

[30] "Guide for Assisting Identity Theft Victims," Federal Trade Commission, 4 (Sept. 2013), http://www.consumer.ftc.gov/articles/pdf-0119-guide-assisting-id-theft-victims.pdf.

[31] *See, e.g.*, Kayleigh Kulp, *Credit Monitoring Services May Not Be Worth the Cost*, Nov. 30, 2017, https://www.cnbc.com/2017/11/29/credit-monitoring-services-may-not-be- worth-the-cost.html.

can an identity monitoring service remove personal information from the dark web.[32] "The people who trade in stolen personal information [on the dark web] won't cooperate with an identity theft service or anyone else, so it's impossible to get the information removed, stop its sale, or prevent someone who buys it from using it."[33]

46.     As a direct and proximate result of the Data Breach, Plaintiff and the Class have had their Private Information exposed, have suffered harm as a result, and have been placed at an imminent, immediate, and continuing increased risk of further harm from fraud and identity theft. Plaintiff and the Class must now take the time and effort to mitigate the actual and potential impact of the Data Breach on their everyday lives, including placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come. Even more seriously is the identity restoration that Plaintiff and other Class Members must go through, which can include spending countless hours filing police reports, following Federal Trade Commission checklists, and calling financial institutions to cancel fraudulent credit applications, to name just a few of the steps.

47.     Plaintiff and the Class have suffered, and continue to suffer, actual harms for which they are entitled to compensation, including but not limited to:

---

[32] *Dark Web Monitoring: What You Should Know*, Consumer Federation of America, Mar. 19, 2019, https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should- know/.
[33] *Id.*

a.  Trespass, damage to, and theft of their personal property including Private Information; Improper disclosure of their Private Information;

b.  The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their Private Information being placed in the hands of criminals and having been already misused;

c.  Loss of privacy suffered as a result of the Data Breach, including the harm of knowing cyber criminals have their Private Information and that identity thieves have already used that information to defraud other victims of the Data Breach;

d.  Ascertainable losses in the form of time taken to respond to identity theft and attempt to restore identity, including lost opportunities and lost wages from uncompensated time off from work;

e.  Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably expended to remedy or mitigate the effects of the Data Breach;

f.  Ascertainable losses in the form of deprivation of the value of Plaintiff's and Class members' personal information for which there is a well-established and quantifiable national and international market;

g.  The loss of use of and access to their credit, accounts, and/or funds;

h.  Damage to their credit due to fraudulent use of their Private Information; and Increased cost of borrowing, insurance, deposits, and,

    i.   the inability to secure more favorable interest rates because of a reduced credit score.

48.    The Private Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[34] For example, Private Information can be sold at a price ranging from $40 to $200.[35]  Criminals can also purchase access to entire company data breaches from $900 to $4,500.[36]

49.    Moreover, Plaintiff and Class Members have an interest in ensuring that their information, which remains in the possession of Defendant and its third-party, is protected from further breaches by the implementation of industry standard security measures, practices, procedures, and protocols. Defendant has shown itself wholly incapable of protecting Plaintiff's Private Information – especially when considering Progressive's prior data security issues identified above.

50.    Plaintiff and Class Members also have an interest in ensuring that their personal information that was provided to Progressive's third-party is removed from the third-party's access.

---

[34] Your personal data is for sale on the dark web. Here's how much it costs, Digital Trends, Oct. 16, 2019, available at: https://www.digitaltrends.com/computing/personal-data-sold- on-the-dark-web-how-much-it-costs/.
[35] Here's How Much Your Personal Information Is Selling for on the Dark Web, Experian, Dec. 6, 2017, available at: https://www.experian.com/blogs/ask-experian/heres-how- much-your-personal-information-is-selling-for-on-the-dark-web/.
[36] *In the Dark*, VPN Overview, 2019, *available at*:
https://vpnoverview.com/privacy/anonymous- browsing/in-the-dark/.

51.     Defendant acknowledged, in the Notice Letter to Plaintiff and other Class Members, that the Data Breach would cause inconvenience to effected individuals by providing numerous steps for Class Members to take in an attempt to mitigate the harm caused by the Data Breach.[37]

52.     In particular, the letter acknowledged that financial harm would likely occur, advising Class Members to review and monitoring their free credit reports for suspicious activity.[38]

53.     At Progressive's suggestion, Plaintiff is desperately trying to mitigate the damage that Progressive has caused him. Given the kind of Private Information Progressive made accessible to third-parties who should have never been trusted with it to begin with, Plaintiff is very likely to incur additional damages. Because identity thieves have their Private Information, Plaintiff and all Class Members will need to have identity theft monitoring protection for the rest of their lives. Some may even need to go through the long and arduous process of getting a new Social Security number, with all the loss of credit and employment difficulties that come with a new number.[39]

54.     None of this should have happened and it was preventable.

---

[37] *See* Exhibit 1.

[38] *Id.*

[39] *Will a New Social Security Number Affect Your Credit?*, LEXINGTON LAW (Nov. 16, 2015), https://www.lexingtonlaw.com/blog/credit-101/will-a-new-social-security- number-affect-your-credit.html.

**D.      Defendant Was Aware of the Risk of Cyber Attacks**

55.      Data security breaches have dominated the headlines for the last two decades. And it doesn't take an IT industry expert to know it. The general public can tell you the names of some of the biggest cybersecurity breaches: Target,[40] Yahoo,[41] Marriott International,[42] Chipotle, Chili's, Arby's,[43] and others.[44]

56.      **Progressive has also personally experienced internal data security issues in recent years**.[45]

57.      Progressive should certainly have been aware, and indeed was aware, that it was at risk of an internal data breach that could expose the Private Information that it collected and maintained.

58.      Progressive was clearly aware of the risks it was taking and the harm that could result from inadequate data security.

---

[40] Michael Kassner, *Anatomy of the Target Data Breach: Missed Opportunities and Lessons Learned*, ZDNET (Feb. 2, 2015), https://www.zdnet.com/article/anatomy-of-the- target-data-breach-missed-opportunities-and-lessons-learned/.

[41] Martyn Williams, *Inside the Russian Hack of Yahoo: How They Did It*, CSOONLINE.COM (Oct. 4, 2017), https://www.csoonline.com/article/3180762/inside-the-russian-hack-of- yahoo-how-they-did-it.html.

[42] Patrick Nohe, *The Marriot Data Breach: Full Autopsy*, THE SSL STORE: HASHEDOUT (Mar. 22, 2019), https://www.thesslstore.com/blog/autopsying-the-marriott-data-breach- this-is-why-insurance-matters/.

[43] Alfred Ng, *FBI Nabs Alleged Hackers in Theft of 15M Credit Cards from Chipotle, Others*, CNET (Aug. 1, 2018), https://www.cnet.com/news/fbi-nabs-alleged-hackers-in- theft-of-15m-credit-cards-from-chipotle-others/?ftag=CMG-01-10aaa1b.

[44] *See, e.g.*, Taylor Armerding, *The 18 Biggest Data Breaches of the 21st Century*, CSO ONLINE (Dec. 20, 2018), https://www.csoonline.com/article/2130877/the-biggest-data- breaches-of-the-21st-century.html.

[45] *See* https://www.computerworld.com/article/2562543/data-breach-at-progressive-highlights- insider-threat.html

E.       **Progress Could Have Prevented The Data Breach**

59.      Data breaches are preventable.[46] As Lucy Thompson wrote in the Data

Breach And Encryption Handbook, "In almost all cases, the data breaches that occurred

could have been prevented by proper planning and the correct design and implementation

of appropriate security solutions."[47] She added that "[o]rganizations that collect, use, store,

and share sensitive personal data must accept responsibility for protecting the information

and ensuring that it is not compromised . . . ."[48]

60.      "**Most of the reported data breaches are a result of lax security and the**

**failure to create or enforce appropriate security policies, rules, and procedures**. . . .

Appropriate information security controls, including encryption, must be implemented and

enforced in a rigorous and disciplined manner so that a *data breach never occurs*."[49]

61.      In a Data Breach like this, many failures laid the groundwork for the Breach.

The FTC has published guidelines that establish reasonable data security practices for

businesses. The FTC guidelines emphasize the importance of having a data security plan,

regularly assessing risks to computer systems, and implementing safeguards to control such

risks.[50] The guidelines establish that businesses should protect the confidential information

that they keep; properly dispose of personal information that is no longer needed; encrypt

---

[46] Lucy L. Thomson, "Despite the Alarming Trends, Data Breaches Are Preventable," *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012) (emphasis added).
[47] *Id.* at 17.
[48] *Id.* at 28.
[49] *Id.*
[50] FTC, *Protecting Personal Information: A Guide for Business*, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

information stored on computer networks; understand their network's vulnerabilities; and implement policies for installing vendor-approved patches to correct security problems. The guidelines also recommended that businesses utilize an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating hacking attempts; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

62.     Upon information and belief, Progressive failed to maintain many reasonable and necessary industry standards necessary to prevent a data breach, including the FTC's guidelines. Upon information and belief, Progressive also failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework, NIST Special Publications 800-53, 53A, or 800-171; the Federal Risk and Authorization Management Program (FEDRAMP); or the Center for Internet Security's Critical Security Controls (CIS CSC), which are well respected authorities in reasonable cybersecurity readiness.

63.     As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[51]

---

[51] *See* How to Protect Your Networks from RANSOMWARE, at 3, available at https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited Aug. 23, 2021).

64.     To prevent and detect cyberattacks, including the cyberattack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the Federal Bureau of Investigation, the following measures:

- Implement an awareness and training program. Because end users are targets, patients and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[52]

65.    In addition, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

-        Apply latest security updates
-        Use threat and vulnerability management
-        Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

-        Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

-        Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

---

[52] *Id.* at 3-4.

**Build credential hygiene**

-        Use [multifactor authentication] or [network level authentication] and use
         strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

-        Monitor for adversarial activities
-        Hunt for brute force attempts
-        Monitor for cleanup of Event Logs
-        Analyze logon events;

**Harden infrastructure**

-        Use Windows Defender Firewall
-        Enable tamper protection
-        Enable cloud-delivered protection
-        Turn on attack surface reduction rules and [Antimalware Scan Interface] for
         Office[Visual Basic for Applications].[53]

66.      Given that Defendant was storing the Private Information of more than
300,000 individuals, Defendant could and should have implemented all of the above
measures to prevent the Data breach.

67.      **Specifically, among other failures, Progressive failed to ensure that the
third-party it hired maintained industry standard data security procedures,
practices, and protocols.**

68.      In sum, this Data Breach could have readily been prevented.

_____

[53] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:*
https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-
preventable-disaster/ (last visited Nov. 11, 2021).

**F.** **Defendant's Response to the Data Breach is Inadequate to Protect Plaintiff and Class Members.**

69.     Defendant failed to inform Plaintiff and Class Members of the Data Breach in time for them to protect themselves from identity theft.

70.     Defendant stated that it discovered the Data Breach in May 2023. And yet, Progressive did not notify affected individuals until August 2023. Even then, Progressive failed to inform Plaintiff and Class Members exactly what information was exposed, how long it was exposed, and how many individuals had unauthorized access to their Private Information in the Data Breach, leaving Plaintiff and Class Members unsure as to the scope of information that was compromised.

71.     During these intervals, the criminals were exploiting the information while Progressive was secretly still investigating the Data Breach.

72.     If Progressive had investigated the Data Breach more diligently and reported it sooner, Plaintiff and the Class could have taken steps to protect themselves sooner and to mitigate the damages caused by the Breach.

## V.  CLASS ACTION ALLEGATIONS

73.     Plaintiff incorporates by reference all preceding paragraphs as if fully restated here.

74.     Plaintiff brings this action against Progressive on behalf of himself and on behalf of all other individuals similarly situated under Federal Rule of Civil Procedure 23. Plaintiff seeks to represent the following class and subclasses:

**Nationwide Class:** All individuals residing in the United States who received a Notice Letter from Progressive informing them that their information may have been compromised in the Data Breach (the "Class").

**California Subclass:** All individuals residing in California who received a Notice Letter from Progressive informing them that their information may have been compromised in the Data Breach (the "California Subclass").

75. Excluded from the Classes are Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and members of their immediate families and judicial staff.

76. Plaintiff reserves the right to amend the above definition or to propose subclasses in subsequent pleadings and motions for class certification.

77. The proposed Classes meets the requirements of Fed. R. Civ. P. 23(a), (b)(1), (b)(2), (b)(3), and (c)(4).

78. **Numerosity:** The proposed Class is so numerous that joinder of all members is impracticable. Defendant has reported that the total number of individuals affected in the Data Breach was 347,100 individuals.

79. **Typicality:** Plaintiff's claims are typical of the claims of the Class. Plaintiff and all members of the Class were injured through Progressive's uniform misconduct. The same event and conduct that gave rise to Plaintiff's claims are identical to those that give rise to the claims of every other Class member because Plaintiff and each member of the Class had their sensitive Private Information compromised in the same way by the same conduct of Progressive.

80.     **Adequacy:** Plaintiff is an adequate representative of the Class because Plaintiff's interests do not conflict with the interests of the Class; Plaintiff has retained counsel competent and highly experienced in data breach class action litigation; and Plaintiff and Plaintiff's counsel intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

81.     **Superiority:** A class action is superior to other available means of fair and efficient adjudication of the claims of Plaintiff and the Class. The injury suffered by each individual class member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult if not impossible for members of the Class individually to effectively redress Progressive's wrongdoing. Even if Class members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

82.     **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include:

     a.  Whether Defendant engaged in the wrongful conduct alleged herein;

b.  Whether Defendant failed to adequately safeguard Plaintiff's and the Class's Private Information;

c.  Whether Defendant failed to ensure the third-party vendor it hired had adequate data security, procedures, practices, and protocols;

d.  Whether Defendant negligently hired and/or failed to supervise the third-party it hired and gave access to Plaintiff and the Class's PII;

e.  Whether Defendant owed a duty to Plaintiff and the Class to adequately protect their Private Information, and whether it breached this duty;

f.  Whether Progressive breached its duties to Plaintiff and the Class as a result of the Data Breach;

g.  Whether Progressive's conduct, including its failure to act, resulted in or was the proximate cause of the breach;

h.  Whether Progressive was negligent in permitting the third-party access to Plaintiff's and the Class's PII;

i.  Whether Progressive was negligent in failing to adhere to reasonable retention policies, thereby greatly increasing the size of the Data Breach;

j.  Whether Progressive failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay;

k.  Whether this caused damages to Plaintiff and the Class;

l.  Whether Progressive continues to breach duties to Plaintiff and the Class;

m. Whether Plaintiff and the Class suffered injury as a proximate result of Progressive's negligent actions or failures to act;

n. Whether Plaintiff and the Class are entitled to recover damages, equitable relief, and other relief;

o. Whether Progressive's actions alleged herein constitute gross negligence; and,

p. Whether Plaintiff and Class Members are entitled to punitive damages.

## VI.   CLAIMS FOR RELIEF

### COUNT I
### Negligence
### (On Behalf of Plaintiff and the Class)

83.     Plaintiff restates and realleges all of the allegations stated above as if fully set forth herein.

84.     Progressive solicited, gathered, and stored the PII of Plaintiff and Class Members, which was in turn, provided to a third-party call center.

85.     Progressive had full knowledge of the sensitivity of the PII that it possessed and provided to the third-party call center and the potential harm that Plaintiff and Class Members could and would suffer if their PII were wrongfully accessed by unauthorized individuals.

86.     Progressive had a duty to Plaintiff and Class Members to exercise reasonable care in selecting, monitoring, and ensuring any third-party provider it hired implemented adequate data security, procedures, and protocols to prevent foreseeable harm

to Plaintiffs and the Class. Including limiting unnecessary access to Plaintiff and the Class's PII.

87.     Progressive had a common law duty to exercise reasonable care to avoid causing foreseeable risk of harm to Plaintiffs and the Class when selecting a third-party provider. Specifically, when selecting a third-party provider who was entrusted with accessing, storing, safeguarding, handling, collecting, and/or protecting the PII provided by Plaintiff and the Class. This duty included taking action to ensure that all third-party providers adequately safeguarded such data, limited unnecessary third-party user access to the Private Information of Plaintiff and the Class, and implemented industry standard security procedures, practices, and protocols. Progressive utterly failed to do any of the above.

88.     Progressive was also responsible for providing timely notification of the Data Breach to Plaintiff and Class Members but failed to do so.

89.     Progressive breached its duties owed to Plaintiff and the Class.

90.     Plaintiff and the Class were injured as a direct and proximate result of Progressive's breaches of their duties.

91.     Plaintiff and Class Members continue to suffer damages and are at an imminent risk of additional harms and damages due to Progressive's breaches.

92.     Accordingly, Plaintiffs and the Class are entitled to compensatory and injunctive relief in an amount to be set forth at trial.

<u>**COUNT II**</u>
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

93.     Plaintiff restates and realleges all of the allegations stated above as if fully set forth herein.

94.     Through the use of Plaintiff's and Class Members' Private Information, Defendant received monetary benefits.

95.     Defendant collected, maintained, and stored the Private Information of Plaintiff and Class Members and, as such, Defendant had direct knowledge of the monetary benefits conferred upon it by Plaintiff and Class Members.

96.     Defendant appreciated that a monetary benefit was being conferred upon it by Plaintiff and Class Members and accepted that monetary benefit.

97.     However, acceptance of the benefit under the facts and circumstances described herein make it inequitable for Defendant to retain that benefit without payment of the value thereof. Specifically, Defendant enriched itself by saving the costs it reasonably should have expended on a third-party with adequate data security measures, procedures and protocols to secure Plaintiff's and Class Members' Private Information. Instead of paying for a third-party who provided a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to increase its own profits at the expense of Plaintiff and Class Members by utilizing a cheaper third-party with little to no data security measures in place. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite data security.

98.     Under the principle of equity and good conscience, Defendant should not be permitted to retain the monetary benefit belonging to Plaintiff and Class Members because Defendant failed to ensure any third-party it hired implements the appropriate data management and security measures.

99.     Defendant acquired the Private Information through inequitable means in that it failed to disclose the inadequate security practices of the third-party it retained, who had access to Plaintiff and the Class's PII.

100.    If Plaintiff and Class Members knew that Defendant had given their Private Information to a third-party with virtually no data security measures in place, they would not have agreed to allow Defendant to have or maintain their Private Information.

101.    As a direct and proximate result of Defendant's decision to profit rather than hire a third-party with adequate data security measures in place, Plaintiff and Class members suffered and continue to suffer actual damages, including (i) the amount of the savings and costs Defendant reasonably should have expended to provide a third-party with adequate data security measures to secure Plaintiff's Private Information, (ii) time and expenses mitigating harms, (iii) diminished value of the Private Information, (iv) harms as a result of identity theft; and (v) an increased risk of future identity theft.

102.    Defendant, upon information and belief, has therefore engaged in opportunistic, unethical, and immoral conduct by profiting from conduct that it knew would create a significant and highly likely risk of substantial and certainly impending harm to Plaintiff and the Class in direct violation of Plaintiff's and Class Members' legally protected interests. As such, it would be inequitable, unconscionable, and unlawful to

31

permit Defendant to retain the benefits it derived as a consequence of its wrongful conduct.

105. Accordingly, Plaintiff and the Class are entitled to relief in the form of restitution and disgorgement of all ill-gotten gains, which should be put into a common fund to be distributed to Plaintiff and the Class.

**COUNT III**
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class)**

103. Plaintiff restates and realleges all of the allegations stated above as if fully set forth herein.

104. Defendant required Plaintiff and Class Members to provide, or authorize the transfer of, their Private Information in order for Progressive to provide services. In exchange, Defendant entered into implied contracts with Plaintiff and Class Members in which Defendant agreed to comply with its statutory and common law duties to protect Plaintiff's and Class members' Private Information and to timely notify them in the event of a data breach.

105. Plaintiff and Class Members would not have provided their Private Information to Defendant had they known that Defendant would not safeguard their Private Information, as promised, or provide timely notice of a data breach.

106. Plaintiff and Class Members would not have provided their Private Information to Defendant had they known that Defendant would hand it over to a third-party with no security measures in place.

107. Plaintiff and Class Members fully performed their obligations under their implied contracts with Defendant.

32

108.    Defendant breached the implied contracts by failing to safeguard Plaintiff's and Class members' Private Information by giving it to a third party with inadequate data security measures, procedures, and protocols, and by failing to provide them with timely and accurate notice of the Data Breach.

109.    The losses and damages Plaintiff and Class members sustained (as described above) were the direct and proximate result of Defendant's breach of its implied contracts with Plaintiff and Class members.

**COUNT IV**
**Declaratory Judgment**
**(On Behalf of Plaintiff and the Class)**

110.    Plaintiff restates and realleges all of the allegations stated above as if fully set forth herein.

111.    This count is brought under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

112.    Defendant owes duties of care to Plaintiff and Class Members that require Defendant to adequately secure their Private Information and ensure it is not given to third-parties with inadequate data security measures.

113.    Defendant still possesses Plaintiff's and Class Members' Private Information.

114.    Defendant does not specify in the Notice Letters what steps they have taken to prevent a data breach from occurring again. Nor has it stated it terminated its relationship with the third-party.

115.     Plaintiff and Class Members are at risk of harm due to the exposure of their Private Information and Defendant's failure to address the security failings that lead to such exposure.

116.     Plaintiff, therefore, seeks a declaration that (1) Defendant's existing security measures, procedures, and protocols do not comply with its duties of care to provide reasonable security procedures and practices appropriate to the nature of the information to protect customers' personal information, and (2) to comply with its duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to:

     i.     Monitoring all third-parties it hires;

     ii.    Ensuring all third-parties it hires employ industry standard data security measures, procedures, practices, and protocols;

    iii.   Engaging third-party security auditors and internal personnel to run automated security monitoring;

    iv.   Auditing, testing, and training their security personnel and third- parties regarding any new or modified procedures;

     v.    Segmenting their user applications by, among other things, creating access controls;

    vi.   Conducting regular database scanning and security checks; vii. Routinely and continually conducting internal training and education to inform internal security personnel and third-parties how to identify and contain a breach when it occurs and what to do in response to a breach;

vii.   Purchasing credit monitoring services for Plaintiff and Class Members for a period of ten years; and,

viii.   Meaningfully educating Plaintiff and Class Members about the threats they face as a result of the loss of their Private Information to third parties, as well as the steps they must take to protect themselves.

## COUNT V
### Negligent Training, Hiring, and Supervision
### (On Behalf of Plaintiff and the Class)

117.   Plaintiff restates and realleges all of the allegations stated above as if fully set forth herein.

118.   At all relevant times, the third-party was Progressive's agent. Progressive granted the third-party access to the PII of Plaintiff and the Class without properly vetting the third-party, inquiring about/ investigating the third-party's data security, training the third-party, advising the third-party of its duties owed to Plaintiffs and the Class, and/or advising the third-party of the confidential nature of Plaintiffs' and the Class's PII.

119.   Progressive was negligent and failed to exercise the requisite standard of care in the hiring, supervision, and retention of the third-party – who disclosed Plaintiffs' and the Class's PII without authorization and caused the damages delineated herein by virtue of the Data Breach.

120.   At all times relevant hereto, Progressive owed a duty to Plaintiff and the Class to train and supervise its agents and third-parties handling sensitive PII in its possession to ensure they recognized the duties owed to Plaintiffs' and the Class to keep their PII safe from unauthorized access.

35

121.    Progressive owed a duty to Plaintiff and the Class to ensure the third-party implemented adequate data security, procedures, and protocols sufficient to protect Plaintiffs' and the Class's PII from unauthorized access prior to hiring the third-party.

122.    Progressive also owed a continuing duty to Plaintiff and the Class to ensure the third-party continued to employ adequate data security, procedures, and protocols sufficient to protect Plaintiffs' and the Class's PII from unauthorized access after hiring the third-party.

123.    Progressive breached this duty by failing to ensure the third-party possessed the requisite data security, procedures, practices, infrastructure, and protocols to protect Plaintiffs' and the Class's PII from unauthorized access prior to hiring the third-party and while the third-party worked for Progressive.

124.    Progressive was on notice of the importance of data security because of well publicized data breaches occurring throughout the United States, and the prior insider threat Progressive has already dealt with. Despite knowledge of prior data breaches and unauthorized access, Progressive failed to ensure the third-party possessed the adequate security posture to protect Plaintiffs' and the Class's PII from unauthorized disclosure.

125.    Progressive knew or should have known that the failure to ensure the third-party employed adequate data security, procedures, and protocols would create an unreasonable risk of danger to persons and property.

126.    As a direct and proximate result of Progressive's breach of its duties, and its negligent hiring, training, selection, and supervision, of the third-party, which resulted in the unauthorized access of Plaintiff's and Class members' confidential PII, Plaintiff and

36

the members of the Class suffered damages, including, without limitation, loss of the

benefit of the bargain, exposure to heightened future risk of identity theft, loss of privacy,

diminution in value of their PII, and actual misuse of their PII.

127.    Progressive was advised of the Breach, but continues to employ the third-

party, putting Plaintiff and the Class at risk of more data breaches in the future.

128.    The acts and omissions of Progressive in negligently hiring, retaining,

training, and/or supervising the third-party are such as to show gross negligence and

reckless disregard for the safety of others and, therefore, punitive damages are appropriate.

### COUNT VI
**Violation of the California Consumer Privacy Act,**
**Cal. Civ. Code §§ 1798.100 *et seq.*, § 1798.150(a)**
**(On Behalf of Plaintiff and the California Subclass)**

129.    Plaintiff restates and realleges all of the allegations stated above as if fully

set forth herein.

130.    The California Consumer Privacy Act ("CCPA"), Cal. Civ. Code §

1798.150(a), creates a private cause of action for violations of the CCPA.   Section

1798.150(a) specifically provides:

> Any consumer whose nonencrypted and nonredacted personal information,
> as defined in subparagraph (A) of paragraph (1) of subdivision (d) of Section
> 1798.81.5, is subject to an unauthorized access and exfiltration, theft, or
> disclosure as a result of the business's violation of the duty to implement and
> maintain reasonable security procedures and practices appropriate to the
> nature of the information to protect the personal information may institute a
> civil action for any of the following:
>
> > (A)  To recover damages in an amount not less than one hundred
> > dollars ($100) and not greater than seven hundred and fifty ($750) per
> > consumer per incident or actual damages, whichever is greater.

37

(B)  Injunctive or declaratory relief.

(C)  Any other relief the court deems proper.

131.    Defendant is a "business" under § 1798.140(b) in that it is a corporation organized for profit or financial benefit of its shareholders or other owners, with gross revenue in excess of $25 million.

132.    Plaintiff and California Subclass Members are covered "consumers" under § 1798.140(g) in that they are natural persons who are California residents.

133.    The personal information of Plaintiff and the California Subclass Members at issue in this lawsuit constitutes "personal information" under § 1798.150(a) and 1798.81.5, in that the personal information Defendant collects and which was impacted by the cybersecurity attack includes an individual's first name or first initial and the individual's last name in combination with one or more of the following data elements, with either the name or the data elements not encrypted or redacted: (i) Social Security number; (ii) Driver's license number, California identification card number, tax identification number, passport number, military identification number, or other unique identification number issued on a government document commonly used to verify the identity of a specific individual; (iii) account number or credit or debit card number, in combination with any required security code, access code, or password that would permit access to an individual's financial account; (iv) medical information; (v) health insurance information; (vi) unique biometric data generated from measurements or technical analysis of human body characteristics, such as a fingerprint, retina, or iris image, used to authenticate a specific individual.

134.    Defendant knew or should have known that its computer systems and data security practices were inadequate to safeguard the California Subclass Members' personal information and that the risk of a data breach or theft was highly likely. Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information of Plaintiff and the California Subclass Members. Specifically, Defendant subjected Plaintiff's and the California Subclass Members' nonencrypted and nonredacted personal information to an unauthorized access and exfiltration, theft, or disclosure as a result of the Defendant's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information, as described herein.

135.    As a direct and proximate result of Defendant's violation of its duty, the unauthorized access and exfiltration, theft, or disclosure of Plaintiff's and California Subclass Members' personal information included exfiltration, theft, or disclosure through Defendant's servers, systems, and website, and/or the dark web, where hackers further disclosed the personal identifying information alleged herein.

136.    As a direct and proximate result of Defendant's acts, Plaintiff and the California Subclass Members were injured and lost money or property, including but not limited to the loss of Plaintiff's and California Subclass Members' legally protected interest in the confidentiality and privacy of their personal information, stress, fear, and anxiety, nominal damages, and additional losses described above.

137.     Section 1798.150(b) specifically provides that "[n]o [prefiling] notice shall be required prior to an individual consumer initiating an action solely for actual pecuniary damages."

138.     Accordingly, Plaintiff and the California Subclass Members by way of this complaint seek actual pecuniary damages suffered as a result of Defendant's violations described herein.

## COUNT VII
**Violation of the California Customer Records Act,**
**Cal. Civ. Code §§ 1798.80 *et seq*.**
**(On Behalf of Plaintiff and the California Subclass)**

139.     Plaintiff restates and realleges all of the allegations stated above as if fully set forth herein.

140.     Cal. Civ. Code § 1798.81.5 provides that "[i]t is the intent of the Legislature to ensure that personal information about California residents is protected. To that end, the purpose of this section is to encourage businesses that own, license, or maintain personal information about Californians to provide reasonable security for that information."

141.     Section 1798.81.5(b) further states that: "[a] business that owns, licenses, or maintains personal information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure."

142.     Cal. Civ. Code § 1798.84(b) provides that [a]ny customer injured by a violation of this title may institute a civil action to recover damages."  Section 1798.84(e)

further provides that "[a]ny business that violates, proposes to violate, or has violated this title may be enjoined."

143.    Plaintiff and the California Subclass Members are "customers" within the meaning of Civ. Code § 1798.80(c) and 1798.84(b) because they are individuals who provided personal information to Defendant, directly and/or indirectly, for the purpose of obtaining a service from Defendant.

144.    The personal information of Plaintiff and the California Subclass Members at issue in this lawsuit constitutes "personal information" under § 1798.81.5(d)(1) in that the personal information Defendant collects and which was impacted by the cybersecurity attack includes an individual's first name or first initial and the individual's last name in combination with one or more of the following data elements, with either the name or the data elements not encrypted or redacted: (i) Social Security number; (ii) Driver's license number, California identification card number, tax identification number, passport number, military identification number, or other unique identification number issued on a government document commonly used to verify the identity of a specific individual; (iii) account number or credit or debit card number, in combination with any required security code, access code, or password that would permit access to an individual's financial account; (iv) medical information; (v) health insurance information; (vi) unique biometric data generated from measurements or technical analysis of human body characteristics, such as a fingerprint, retina, or iris image, used to authenticate a specific individual.

145.    Defendant knew or should have known that its computer systems and data security practices were inadequate to safeguard the Plaintiff's and California Subclass

41

Members' personal information and that the risk of a data breach or theft was highly likely. Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information of Plaintiff and the California Subclass Members. Specifically, Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information of Plaintiff and the California Subclass Members from unauthorized access, destruction, use, modification, or disclosure. Defendant further subjected Plaintiff's and the California Subclass Members' nonencrypted and nonredacted personal information to an unauthorized access and exfiltration, theft, or disclosure as a result of the Defendant's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information, as described herein.

146.     As a direct and proximate result of Defendant's violation of its duty, the unauthorized access, destruction, use, modification, or disclosure of the personal information of Plaintiff and the California Subclass Members included hackers' access to, removal, deletion, destruction, use, modification, disabling, disclosure and/or conversion of the personal information of Plaintiff and the California Subclass Members by the ransomware attackers and/or additional unauthorized third parties to whom those cybercriminals sold and/or otherwise transmitted the information.

147.     As a direct and proximate result of Defendant's acts or omissions, Plaintiff and the California Subclass Members were injured and lost money or property including, but not limited to, the loss of Plaintiff's and the California Subclass Members' legally

42

protected interest in the confidentiality and privacy of their personal information, nominal damages, and additional losses described above. Plaintiff seeks compensatory damages as well as injunctive relief pursuant to Cal. Civ. Code § 1798.84(b).

148.    Moreover, the California Customer Records Act further provides: "A person or business that maintains computerized data that includes personal information that the person or business does not own shall notify the owner or licensee of the information of the breach of the security of the data immediately following discovery, if the personal information was, or is reasonably believed to have been, acquired by an unauthorized person." Cal. Civ. Code § 1798.82.

149.    Any person or business that is required to issue a security breach notification under the CRA must meet the following requirements under §1798.82(d):

    a.  The name and contact information of the reporting person or business subject to this section;

    b.  A list of the types of personal information that were or are reasonably believed to have been the subject of a breach;

    c.  If the information is possible to determine at the time the notice is provided, then any of the following:

        i.    the date of the breach,

        ii.    the estimated date of the breach, or

        iii.    the date range within which the breach occurred. The notification shall also include the date of the notice;

    d. Whether notification was delayed as a result of a law enforcement investigation, if that information is possible to determine at the time the notice is provided;

    e. A general description of the breach incident, if that information is possible to determine at the time the notice is provided;

    f. The toll-free telephone numbers and addresses of the major credit reporting agencies if the breach exposed a social security number or a driver's license or California identification card number;

    g. If the person or business providing the notification was the source of the breach, an offer to provide appropriate identity theft prevention and mitigation services, if any, shall be provided at no cost to the affected person for not less than 12 months along with all information necessary to take advantage of the offer to any person whose information was or may have been breached if the breach exposed or may have exposed personal information.

150.    Defendant failed to provide the legally compliant notice under § 1798.82(d) to Plaintiff and members of the California Subclass. On information and belief, to date, Defendant has not sent written notice of the data breach to all impacted individuals. As a result, Defendant has violated § 1798.82 by not providing legally compliant and timely notice to all California Subclass Members. Because not all members of the class have been notified of the breach, members could have taken action to protect their personal information, but were unable to do so because they were not timely notified of the breach.

44

151.     On information and belief, many California Subclass Members affected by the breach have not received any notice at all from Defendant in violation of Section 1798.82(d).

152.     As a result of the violations of Cal. Civ. Code § 1798.82, Plaintiff and California Subclass Members suffered incrementally increased damages separate and distinct from those simply caused by the breaches themselves.

153.     As a direct consequence of the actions as identified above, Plaintiff and California Subclass Members incurred additional losses and suffered further harm to their privacy, including but not limited to economic loss, the loss of control over the use of their identity, increased stress, fear, and anxiety, harm to their constitutional right to privacy, lost time dedicated to the investigation of the breach and effort to cure any resulting harm, the need for future expenses and time dedicated to the recovery and protection of further loss, and privacy injuries associated with having their sensitive personal, financial, and payroll information disclosed, that they would not have otherwise incurred, and are entitled to recover compensatory damages according to proof pursuant to § 1798.84(b).

## COUNT VIII
### Violation of the California Unfair Competition Law,
### Cal. Bus. & Prof. Code §17200 *et seq.*
### (On Behalf of Plaintiff and the California Subclass)

154.     Plaintiff restates and realleges all of the allegations stated above as if fully set forth herein.

155.     Defendant is a "person" defined by Cal. Bus. & Prof. Code § 17201.

156.    Defendant violated Cal. Bus. & Prof. Code § 17200 *et seq.* ("UCL") by engaging in unlawful, unfair, and deceptive business acts and practices.

157.    Defendant's "unfair" acts and practices include:

a.  Defendant failed to implement and maintain reasonable security measures to protect Plaintiff's and California Subclass Members' personal information from unauthorized disclosure, release, data breaches, and theft, which was a direct and proximate cause of the Defendant Data Breach. Defendant failed to identify foreseeable security risks, remediate identified security risks, and adequately improve security following previous cybersecurity incidents and known coding vulnerabilities in the industry;

b.  Defendant's failure to implement and maintain reasonable security measures also was contrary to legislatively-declared public policy that seeks to protect consumers' data and ensure that entities that are trusted with it use appropriate security measures. These policies are reflected in laws, including the FTC Act (15 U.S.C. § 45), California's Customer Records Act (Cal. Civ. Code § 1798.80 *et seq.*), and California's Consumer Privacy Act (Cal. Civ. Code § 1798.150);

c.  Defendant's failure to implement and maintain reasonable security measures also led to substantial consumer injuries, as described above, that are not outweighed by any countervailing benefits to consumers or competition. Moreover, because consumers could not know of Defendant's

inadequate security, consumers could not have reasonably avoided the harms that Defendant caused; and

d. Engaging in unlawful business practices by violating Cal. Civ. Code § 1798.82.

158. Defendant has engaged in "unlawful" business practices by violating multiple laws, including California's Consumer Records Act, Cal. Civ. Code §§ 1798.81.5 (requiring reasonable data security measures) and 1798.82 (requiring timely breach notification), California's Consumer Privacy Act, Cal. Civ. Code § 1798.150, California's Consumers Legal Remedies Act, Cal. Civ. Code §§ 1780, *et seq*., the FTC Act, 15 U.S.C. § 45, and California common law.

159. Defendant's unlawful, unfair, and deceptive acts and practices include:

a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and California Subclass Members' personal information, which was a direct and proximate cause of the Defendant Data Breach;

b. Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Defendant Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and California Subclass Members' personal information, including duties imposed by the FTC Act, 15 U.S.C.

§ 45, California's Customer Records Act, Cal. Civ. Code §§ 1798.80 *et seq.*, and California's Consumer Privacy Act, Cal. Civ. Code § 1798.150, which was a direct and proximate cause of the Defendant Data Breach;

d. Misrepresenting that it would protect the privacy and confidentiality of Plaintiff's and California Subclass Members' personal information, including by implementing and maintaining reasonable security measures;

e. Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and California Subclass Members' personal information, including duties imposed by the FTC Act, 15 U.S.C. § 45, California's Customer Records Act, Cal. Civ. Code §§ 1798.80, *et seq.*, and California's Consumer Privacy Act, Cal. Civ. Code § 1798.150;

f. Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and California Subclass Members' personal information; and

g. Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and California Subclass Members' personal information, including duties imposed by the FTC Act, 15 U.S.C. § 45, California's Customer Records Act, Cal. Civ. Code §§ 1798.80, *et seq.*, and California's Consumer Privacy Act, Cal. Civ. Code § 1798.150.

160.     Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of consumers' personal information.

161.     As a direct and proximate result of Defendant's unfair, unlawful, and fraudulent acts and practices, Plaintiff and California Subclass Members' were injured and lost money or property,  which would not have occurred but for the unfair and deceptive acts, practices, and omissions alleged herein, monetary damages from fraud and identity theft, time and expenses related to monitoring their financial accounts for fraudulent activity, an increased, imminent risk of fraud and identity theft, and loss of value of their personal information.

162.     Defendant's violations were, and are, willful, deceptive, unfair, and unconscionable.

163.     Plaintiff and California Subclass Members have lost money and property as a result of Defendant's conduct in violation of the UCL, as stated herein and above.

164.     By deceptively storing, collecting, and disclosing their personal information, Defendant has taken money or property form Plaintiff and California Subclass Members.

165.     Defendant acted intentionally, knowingly, and maliciously to violate California's Unfair Competition Law, and recklessly disregarded Plaintiff's and California Subclass Members' rights. Past data breaches put it on notice that its security and privacy protections were inadequate.

166.     Plaintiff and California Subclass Members seek all monetary and nonmonetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices or use of their personal information; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief, including public injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and Class Members, requests judgment against Defendant and that the Court grant the following:

A.   For an Order certifying this action as a class action and appointing Plaintiff and his counsel to represent the Class and Subclass, pursuant to Federal Rule of Civil Procedure 23;

B.   For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' PII, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

C.   For injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

i.     prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii.     requiring Defendant to protect, including through encryption, all data collected through the course of their business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii.    requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv.    requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiff and Class Members;

v.     prohibiting Defendant from maintaining the PII of Plaintiff and Class Members on a cloud-based database;

vi.    requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii.     requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.    requiring Defendant to audit, test, and train their security personnel regarding any new or modified procedures; requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

ix.      requiring Defendant to conduct regular database scanning and securing checks;

x.       requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xi.      requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xii.   requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiii.  requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xiv.   requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xv.    requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xvi.   for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of

the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.   For an award of actual damages, compensatory damages, statutory damages, and nominal damages, in an amount to be determined, as allowable by law;

E.   For an award of punitive damages, as allowable by law;

F.   For an award of attorneys' fees and costs, and any other expenses, including expert witness fees;

G.   Pre- and post-judgment interest on any amounts awarded; and

H.   Such other and further relief as this court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a trial by jury on all triable issues.


DATED:  August 9, 2023          Respectfully submitted,

*/s/ Gary M. Klinger*
Gary M. Klinger
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN LLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Phone: (866) 252-0878
gklinger@milberg.com

*Counsel for Plaintiff and the Proposed Class*

54